**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISTEN SCHERTZER; BRITTANY COVELL, individually and on behalf of all others similarly situated, | No. 23-55104 |
| | D.C. No. 3:19-cv-00264-JM-MSB |
| *Plaintiffs-Appellants*, | |
| v. | |
| | OPINION |
| BANK OF AMERICA, NA, | |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted May 13, 2024
Pasadena, California

Filed July 29, 2024

Before: Ronald Lee Gilman,[*] Ronald M. Gould, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Gould

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Breach of Contract / California Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of Bank of America ("BOA"), and vacated the district court's denial of class certification, in plaintiff's putative class action alleging claims for breach of contract and breach of the implied covenant of good faith and fair dealing, based on fees BOA charged when plaintiff used a non-BOA ATM.

BOA charged plaintiff, a BOA accountholder, two separate out-of-network balance inquiry fees when she used her BOA debit card at a non-BOA ATM. Plaintiff claimed that only the first of two fees was permissible under the parties' contract.

The panel reversed the district court's summary judgment in favor of BOA on plaintiff's claim for breach of contract. The panel agreed with plaintiff that the term "balance inquiry," as used in the contractual documents, means a customer-initiated transaction like a withdrawal, where BOA can charge customers only when the customer explicitly requests balance information. The panel rejected BOA's argument—that it lacked control over third-party ATM operators or the fashioning of their screen prompts and therefore cannot be held responsible for customer responses to the screen prompts—because BOA's level of control over

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the ATM operators has no effect on the question of contract interpretation raised in this case.

The panel affirmed the district court's summary judgment in favor of BOA on plaintiff's claim for breach of the implied covenant of good faith and fair dealing because the claim is indistinguishable from plaintiff's breach of contract claim and therefore superfluous.

The panel rejected BOA's argument that plaintiff's failure to follow the contract's pre-dispute procedures presented an independent ground for summary judgment because there was no indication that these procedures covered situations in which customers believe that BOA has overcharged them in violation of the contract.

Finally, the panel vacated the district court's denial of class certification and remanded for the district court to reconsider class certification.

## COUNSEL

Jae K. Kim (argued), Lynch Carpenter LLP, Pasadena, California; Todd D. Carpenter and Tiffine E. Malamphy, Lynch Carpenter LLP, Del Mar, California; Sophia G. Gold and Jeffrey D. Kaliel, KalielGold PLLC, Washington, D.C.; for Plaintiffs-Appellants.

Shawn R. Obi (argued) and Amanda L. Groves, Winston & Strawn LLP, Los Angeles, California, for Defendant-Appellee.

# OPINION

GOULD, Circuit Judge:

Plaintiff Brittany Covell,[1] a Bank of America ("BOA") accountholder, brought this putative class action against BOA, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing, based on fees BOA charged when Plaintiff used a non-BOA ATM. The district court granted summary judgment in favor of BOA and denied class certification. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

BOA charged Plaintiff two separate $2.50 out-of-network ("OON") balance inquiry fees when she used her BOA debit card at a non-BOA ATM. Plaintiff claims that only the first of the two fees was permissible under the parties' contract. The contract allows BOA to charge OON balance inquiry fees, but whether the fee at issue was permissible depends on how "balance inquiry" is defined. Under Plaintiff's definition, she did not make a second "balance inquiry" within the meaning of the contract; under BOA's definition, she did. The factual circumstances surrounding Plaintiff's transaction are undisputed.

---

[1] At the time of the district court's final order, Kristin Schertzer was also a named plaintiff in the action, but this appeal is maintained solely by Covell.

## I.   **The ATM Transaction**

### A.  **First Balance Inquiry Charge**

A customer initiates a transaction at a non-BOA ATM by inserting her debit card.  The ATM then prompts the customer: "Would you like to view your Account Balance?", with buttons for "Yes" or "No."  If the customer selects "Yes," the next screen prompts the customer to "Select inquiry account," with buttons for "Checking," "Savings," and "Credit Card."  Once the customer selects an account, the ATM transmits an electronic "balance inquiry request" to BOA, and BOA charges the customer a $2.50 OON balance inquiry fee.  The ATM then displays the customer's balance information for the account selected.

### B.  **Second Balance Inquiry Charge**

On the screen displaying the customer's balance, the ATM next prompts the customer: "Would you like to print your Balance and continue the Transaction?", with buttons for "Continue" and "Cancel."  If the customer selects "Continue," the ATM transmits a second electronic balance inquiry request to BOA, and BOA charges the customer another $2.50 OON balance inquiry fee.  The ATM then displays a menu of transactions with which the customer can proceed, including "Withdrawal," "Transfer," and "Inquiry."  Once the customer completes one of these transactions, the ATM prints a receipt displaying the customer's balance information.

Plaintiff does not dispute that the first OON fee—incurred when she selected "Yes" to the prompt asking her if she wanted "to view your Account Balance"—was permissible under the parties' contract as a balance inquiry fee.  But Plaintiff contends that the second OON fee was not

permissible under the contract, because she did not initiate a "balance inquiry" when she elected to "print [her] Balance and continue the Transaction."

## II.    <u>Governing Agreements</u>

The parties agree that this case is governed by three contractual documents (collectively, the "Account Documents"): (1) the "Deposit Agreement and Disclosures" (the "Deposit Agreement"); (2) the "Important Information Brochure: Card Agreement and Disclosure" (the "Brochure"); and the "Personal Schedule of Fees" (the "Fee Schedule").[2]   The relevant provisions in each document are as follows.

Deposit Agreement

> *ATM Fees*.  When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

> *Other Fees*.   For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for

---

[2] The district court also referred to the "Schedule of Electronic Fees and Dollar Limits on Transactions Supplement to Your Card Agreement," but this document is duplicative of the Fee Schedule.

Online and Mobile Banking services and the separate agreement for ATM and debit cards.

Brochure

"You authorize us to act on the instructions you give us through ATMs."

Fee Schedule

| Fee Name/Description | Fee Amount | Other Important Information About This Fee |
|---|---|---|
| Non-Bank of America ATM Fee for: Withdrawals, transfers and balance inquiries at a non-Bank of America ATM in the U.S. | $2.50 each | When you use a non-Bank of America ATM, you may also be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer. |

## III.   Procedural History

Plaintiff originally brought this action against not only BOA, but also the operators of the non-BOA ATMs, Cardtronics, FCTI, and Cash Depot (the "ATM Operators"). The ATM Operators filed motions to dismiss under Rule 12(b)(6) arguing, *inter alia*, that Plaintiff had not alleged damages because the OON fee at issue was charged by BOA and not by the ATM Operators. Plaintiff settled with the

ATM Operators before their motions were decided. The case now consists solely of claims against BOA for breach of contract and breach of the implied covenant of good faith and fair dealing.

Plaintiff contends that she was charged two OON fees by BOA when she conducted a transaction at an ATM operated by FCTI. She seeks to bring this action on behalf of all similarly situated BOA customers. Plaintiff moved to certify a class of:

> All Bank of America, N.A., checking account holders in the United States who since May 1, 2018 were assessed two (2) out-of-network fees for a single balance inquiry undertaken at FCTI, Inc.'s ATM machines located in 7-Eleven stores.[3]

BOA opposed class certification and moved for summary judgment on Plaintiff's breach of contract and implied covenant claims. The district court granted summary judgment on both claims and denied class certification. *Schertzer v. Bank of America*, Case No. 19-cv-264, 2022 WL 1004559 (S.D. Cal. Apr. 4, 2022). Shortly thereafter, the district court denied Plaintiff's motion for reconsideration. Plaintiff timely appealed the district court's summary judgment, class certification, and reconsideration orders.

---

[3] Then-plaintiff Schertzer also sought to certify a class of Cardtronics ATM users, but Covell does not appeal the district court's denial of certification as to that class.

# DISCUSSION

## I.   Breach of Contract

### A. Parties' Interpretations of "Balance Inquiry"

The Account Documents do not define "balance inquiry." *Schertzer*, 2022 WL 1004559, at *8. As an initial matter, we must clarify the parties' competing definitions of the term. The district court adopted BOA's interpretation. However, we conclude that the district court misunderstood Plaintiff's proposed interpretation.

Plaintiff had argued to the district court that to make a "balance inquiry" under the contract "reasonably means that *customers* must have affirmatively *requested* . . . their account balance information" and that "the party that is relevant in determining whether balance information has been requested is the customer, not the ATM machine or network."

In rejecting this interpretation and adopting BOA's alternative, the district court relied on a provision in the Deposit Agreement and Brochure that reads:

> *ATM Fees.* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete

a fund transfer. We may also charge you fees.[4]

Referring to the first sentence of this paragraph, the district court mistakenly characterized Plaintiff's interpretation of "balance inquiry" as "suggesting a subjective consent/intent requirement into the 'when you use a non-Bank of America ATM' clause for a 'balance inquiry.'" *Schertzer*, 2022 WL 1004559, at *9. The district court rejected what it understood to be Plaintiff's interpretation, stating:

> Reading the contract as a whole, and in a commonsense manner, the phrase appears to refer to a customer's general use of the ATM. That is when a customer places their debit/credit card in an ATM machine and enters their PIN and selects options on the screen to access their bank account/s, they are "using" a non-Bank of America ATM machine. The fact that the actions are being performed by the customer implicitly signifies consent in the circumstances. In other words, the "instruction"[5] is carried out by the customer hitting buttons or prompts on the ATM screen over which [BOA] has no control. To require [BOA] to glean the subjective intent of OON ATM users defies

---

[4] The last sentence of the provision appears only in the Deposit Agreement.

[5] This is a reference to the Brochure, which states: "You authorize us to act on the instructions you give us through ATMs."

logic and common sense given the protocols
and mechanics of OON ATMs.

*Id.*

The district court concluded that the Account Documents unambiguously allow BOA to charge an OON fee for each electronic balance inquiry request transmitted by the ATM in response to customer selections on the ATM screen, regardless of whether those selections explicitly referred to balance information.  The district court reasoned that even if the term were ambiguous and extrinsic evidence were considered, the result would be the same.  *Id.* at *9-12.

BOA and the district court misconstrue Plaintiff's interpretation as requiring BOA to divine a customer's subjective intent each time the customer presses a button on an ATM.   The district court misunderstood Plaintiff's interpretation to include a requirement that balance inquiries be performed "knowingly" or "intentionally"—terms BOA repeats on appeal to undermine Plaintiff's arguments.  But these terms do not appear anywhere in Plaintiff's briefs.

Plaintiff's interpretation of "balance inquiry," as "reasonably mean[ing] that customers must have affirmatively requested . . . their account balance information," does not in fact imply a subjective intent requirement.  Plaintiff simply argues that the *customer* must make the balance inquiry, as opposed to the ATM transmitting an inquiry to BOA with or without the customer requesting one.   Determining whether a customer has initiated a balance inquiry does not require probing her subjective intent; it merely requires that the consumer has made the balance inquiry.  Plaintiff concedes that when a customer presses a button on an ATM that says "balance

information" (or something similarly explicit) it is *objectively* clear that the customer has requested a balance inquiry.

Plaintiff's interpretation is based on objective manifestations of consent commonly required in electronic transactions. In cases where consumers interact with websites, for example, this court and others have required that the customer "take an[] affirmative action to demonstrate assent" to terms of service. *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178-79 (9th Cir. 2014); *see also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) ("Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement."); *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 29, 31, 33-34 (2d Cir. 2002) (requiring "that a user's act . . . manifest assent to contract terms"). Although these cases involve contract formation rather than performance, they illustrate that there is nothing novel or unusually burdensome about requiring a merchant to determine whether a customer has objectively manifested consent to a transaction.[6] These cases serve as a guide in assessing consent to electronic transactions.

In summary, we are presented with two interpretations of the term "balance inquiry." Plaintiff's interpretation

---

[6] Indeed, a recent district court decision that considered a challenge to a similar balance-inquiry fee rejected defendant FTCI's contention that the plaintiffs' claims required "the Court [to] probe whether each individual customer relied on the allegedly deceptive [ATM screen prompt]." *Polvay v. FTCI, Inc.*, 2024 WL 322050, at *2-3, 5 (S.D.N.Y. Jan. 29, 2024).

allows a customer to be charged for a "balance inquiry" under the contract only if it is objectively clear that the customer requested balance information from the ATM—for example, by selecting "Yes" in response to a prompt reading "Would you like to view your Account Balance?" Plaintiff thus characterizes a "balance inquiry" as a *customer-initiated* transaction in which the customer inquires about her balance.

In sharp contrast, BOA's interpretation, adopted by the district court, allows BOA to charge a customer for a "balance inquiry" anytime that an ATM sends an electronic message to BOA requesting balance information, regardless of what the customer pressed on the ATM screen. BOA and the district court thus conceive of a "balance inquiry" as an *ATM-initiated* transaction that occurs whether or not a customer makes any inquiry at all.

We adopt Plaintiff's interpretation and reverse the district court's grant of summary judgment for BOA.

## B. Contract Interpretation

The parties agree that California law governs their contract. Contract interpretation is a question of law, which we review *de novo*. *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 925-26 (9th Cir. 2003) (*per curiam*); *Trustees of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008).

"The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002). "Such intent is to be inferred, if possible, solely from the written provisions of the contract, *County of Fresno v. Frensno*

*Deputy Sheriff's Ass'n*, 51 Cal. App. 5th 282, 292 (2020), "if the language is clear and explicit, and does not involve an absurdity," Cal. Civ. Code § 1638.

California law provides several principles that guide our inquiry into what the parties mutually intended a contract term to mean. Synthesizing these principles, we consider whether a proffered interpretation: (1) aligns with the ordinary and popular meaning of the term; (2) gives effect to all of a contract's provisions or renders some superfluous; (3) is supported by reading the contract as a whole; (4) would produce an absurd or inequitable result. We have applied each of these principles to interpretation of the term "balance inquiry" and conclude that these contract interpretation principles all support Plaintiff's interpretation of the term.

### i. The "Ordinary and Popular" Meaning of "Balance Inquiry"

Under California contract law, applicable here, terms must be "understood in their ordinary and popular sense rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." Cal. Civ. Code § 1644. The "ordinary and popular" meaning of a term is "the meaning a layperson would ascribe to [it]." *Sup. Ct. of Alameda Cnty. v. County of Alameda*, 65 Cal. App. 5th 838, 850 (2021) (quoting *AIU Ins. Co. v. Sup. Ct.*, 51 Cal. 3d 807, 821-22 (1990)); *see also Ray v. Farmers Ins. Exch.*, 200 Cal. App. 3d 1411 (1988).

The district court's interpretation of "balance inquiry," characterized to include an inquiry made by the ATM computer, does not represent the "ordinary and popular" meaning of the term. The district court defined "balance

inquiry" as an electronic transmittal between an ATM and BOA that can occur even when a customer has not requested balance information. *See Schertzer*, Case No. 19cv264, Dkt. 271 at 15-16. In adopting this interpretation, the district court assumed that a layperson would be well-versed in the electronic transmittals that occur between the ATM and BOA. In the district court's view, a layperson reading BOA's contract would understand that "balance inquiry" could not refer to anything other than these electronic transmittals. We conclude that these assumptions are unreasonable and do not plausibly represent a layperson's understanding of "balance inquiry."

BOA's and the district court's interpretation of "balance inquiry" is more akin to a technical definition understood by those in the industry familiar with how ATMs work. Indeed, BOA submitted a lengthy expert report to the district court describing the process that occurs when an ATM transmits a balance inquiry request to a bank. The process was broken down into no fewer than nine steps, complete with a diagram. But nothing in the Account Documents tells a consumer that the contract term "balance inquiry" refers to such a complicated automated process. *See* Cal. Civ. Code § 1644 (technical meanings of terms do not apply "unless used by the parties in a technical sense, or unless a special meaning is given to them by usage"). BOA accountholders are generally not sophisticated parties likely to be familiar with the mechanics of ATM transmittals or the technical meaning of the term "balance inquiry" proffered by BOA. *See Universal Cable Productions, LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1153–54 (9th Cir. 2019) (industry usage of insurance term applied where insured was a sophisticated party who conducted frequent business related to the insurance trade); *see also* Cal. Civ. Code § 1645

(technical terms are "interpreted as usually understood by persons in the profession or business to which they relate").

In contrast, Plaintiff's interpretation—that a "balance inquiry" occurs when a customer objectively makes a request for balance information—aligns with the ordinary and popular meaning of the term.  Consumers who use ATMs and sign up for a debit card would be familiar with the term "balance inquiry," because it often appears as an option on ATM screens alongside "withdrawal" and "transfer," and as a prompt that explicitly refers to "balance information."  The "Network Rules" binding all of the ATMs at issue require that ATMs offer a balance inquiry option.  A reasonable consumer would understand—without need for an expert report—that by responding "Yes" to the prompt "Would you like to view your Account Balance?", she is inquiring about her balance information.[7]  A customer reading the Account Documents would naturally associate the term "balance inquiry" with this familiar ATM transaction.[8]

We conclude that the ordinary and popular meaning of "balance inquiry" requires an objectively clear customer request for balance information from the ATM.  Only then would it be reasonable for a bank to charge its customers a balance inquiry fee.

---

[7] Different ATM screens present the balance inquiry option in different ways.  Sometimes the screen will display an option labeled "inquiry," but at other times the ATM will prompt the customer "Would you like to view your balance?".

[8] Consistent with the popular meaning of the term, Plaintiff does not challenge the validity of the first OON charge, incurred when Plaintiff selected "Yes" in response to the prompt: "Would you like to view your Account Balance?".

### ii. Interpretation Should Not Render Part of the Contract "Superfluous, Useless, or Inexplicable"

"An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 420 (2012) (citation omitted).

BOA's and the district court's interpretation of "balance inquiry" violates this principle. The district court relied on the "ATM Fees" provision in the Deposit Agreement and in the Brochure, which reads:

> *ATM Fees*. When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

> *Other Fees*. For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

The district court extrapolated from the "When you use" language in the first sentence of the "ATM Fees" provision to conclude that, "when a customer places their debit/credit

card in [a non-BOA] ATM machine . . . [,] they are 'using' a non-Bank of America ATM machine. . . . [and that] fact . . . implicitly signifies consent." *Schertzer*, 2022 WL 1004559, at *9.

However, the district court ignored the phrase "We [(i.e., BOA)] may also charge you fees" at the end of the Deposit Agreement provision. This phrase is critical. A statement that "[BOA] may also charge you fees" indicates that the preceding "When you use" language does *not* refer to BOA fees. If the "When you use" language referred to fees that BOA may charge, then the words "[BOA] may also charge you fees" would be superfluous or inexplicable.

The district court also ignored that the clause it relied upon explicitly states that, "[w]hen you use an ATM . . . , you may be charged a fee *by the ATM operator*." The district court nevertheless interpreted this clause as referring to BOA-charged fees. This interpretation renders the "by the ATM operator" language inexplicable.

A more natural reading of the provision giving effect to all its parts is that the first ("When you use") sentence refers to fees charged by ATM operators, and the second sentence refers to BOA fees that are detailed in a separate provision. The provision that states "We may also charge you fees" is immediately followed by the "Other Fees" provision that refers to the Fee Schedule where BOA's fees (including the balance inquiry fee) are listed.

We conclude that the "When you use" provision cannot be read to support BOA's interpretation of the term "balance inquiry" without rendering other provisions superfluous or inexplicable.

### iii. Reading the Contract as a Whole

Contracts are interpreted as a whole "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. "The meaning of the words contained in a contract is to be determined not from a consideration of the words alone but from a reading of the entire contract." *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1976) (quoting *Sunset Sec. Co. v. Coward McCann, Inc.*, 47 Cal. 2d 907, 911 (1957)).

Reading the Account Documents as a whole supports that "balance inquiry" refers to a customer-initiated request for balance information. The Fee Schedule states that a $2.50 OON fee may be charged for "Withdrawals, transfers and balance inquiries." Withdrawals and transfers are unquestionably customer-initiated transactions. The Account Documents make clear that an ATM cannot initiate a withdrawal or transfer without a customer's permission. "Balance inquiry" is listed alongside these terms, which reasonably suggests that it too is a customer-initiated transaction. The customer would naturally assume that she initiates a balance inquiry in the same way that she initiates a withdrawal: by selecting an option that explicitly refers to the desired transaction. Thus, in the normal case, a balance inquiry is made by the customer, not by the bank. The Account Documents do not mention ATMs' electronic transmittals to BOA or otherwise suggest that the balance inquiry fee might be connected to them.

Plaintiff's contention that "balance inquiry" refers to a customer-initiated transaction is reinforced by language in the Brochure that states: "You authorize us to act on the instructions you give us through ATMs." BOA's

interpretation of "balance inquiry" explicitly maintains that it acts on instructions it receives from *the ATM*. BOA states that it does not know what customers are selecting on the ATM screen; it knows only what messages the ATM is sending to BOA. BOA's interpretation of "balance inquiry" contradicts the contractual provision that provides BOA will act on the *customer's* instructions.

### iv. Interpretation Should Not Produce an "Absurdity" or an "Inequitable" Agreement

Our interpretation of terms in a contract "must be fair and reasonable, not leading to absurd conclusions." *State Compensation Ins. Fund v. Dep't of Ins.*, 96 Cal. App. 5th 227, 236 (2023) (citation omitted). We "avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." *Barroso v. Ocwen Loan Servicing, LLC*, 208 Cal. App. 4th 1001, 1013 (2012) (citation omitted).

BOA's and the district court's interpretation of the contract produces an absurd and inequitable result. The district court's reasoning suggests that a customer "implicitly . . . consent[s]" to fees associated with an ATM transaction by "using" the ATM, even if the customer cannot reasonably know that his actions are generating fees. *See Schertzer*, 2022 WL 1004559, at *9. Under this interpretation, a customer's use of an ATM gives a blank check to BOA for any fees BOA decides to charge. As Plaintiff hypothesized before the district court, "[BOA] could charge consumers for a balance inquiry if the Bank receives notice from an ATM operator, even if a consumer clicks 'no' and declines to perform a balance inquiry, or even if the customer was prompted a different transaction than a balance inquiry." *Id.* (citation omitted).

The Account Documents do not indicate that customers intended that their insertion of a debit card into an ATM would give BOA such vast discretion. Plaintiff's interpretation avoids this inequitable result because it understands a "balance inquiry" to be a customer-initiated transaction like a withdrawal, where BOA can charge customers only when the customer explicitly requests balance information.

## C. BOA's Lack of Control over Third-Party ATM Operators

BOA persuaded the district court that, because BOA allegedly has no control over the ATM Operators or the fashioning of their screen prompts, the court could not hold BOA responsible for fees generated by customer responses to the screen prompts. We reject this line of reasoning because BOA's level of control over the ATM Operators has no effect on the question of contract interpretation before us.

BOA's control over the ATM Operators does not speak to what BOA and Plaintiff mutually intended when they agreed to the Account Documents. BOA's relationship with the ATM Operators is not described in the Account Documents. An ordinary consumer would not know of this relationship when reviewing the Account Documents. There is no reason to believe that BOA's control over the ATM Operators—totally unknown to ordinary consumers—bears on a customer's interpretation of the term "balance inquiry." This makes it irrelevant to the contract interpretation inquiry.

The district court framed BOA's control over the ATM Operators in terms reminiscent of the duty of care that arises in tort cases. The district court reasoned that, "[w]hile the practices of the ATM Operators may indeed be questionable," BOA has no control over the "buttons or

prompts on the ATM screen," and "[a]bsent any agency relationship, the court is loath to hold [BOA] responsible for the actions of a third party." *Id.* at 16, 20.

Yet there are no tort claims in this action. Plaintiff's claims arise from a contract dispute between Plaintiff and BOA. The "practices of the ATM Operators" are not at issue. Plaintiff does not allege that she was harmed by the ATM Operators. Plaintiff alleges that she was harmed by BOA. BOA—not the ATM Operators—charged the second OON fee at issue. BOA's control or lack of control over the ATM Operators does not relieve BOA of its contractual duty to charge only those fees permitted by the Account Documents.

The district court's passing reference to an "agency relationship" is another inapposite allusion to tort law. An agency relationship is relevant in cases where "[a] principal who conducts an activity through an agent is subject to liability for harm to a third party *caused by the agent's conduct.*" Restatement (Third) of Agency § 7.05 (2006) (emphasis added); *see also Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448-49 (9th Cir. 2018). Here, Plaintiff does not allege any harm caused by the ATM Operators, whether they are BOA's agents or not. Plaintiff's suit seeks to hold BOA responsible for BOA's own alleged breach of the parties' contract.

## D. Extrinsic Evidence

Under California law, we consider extrinsic evidence if it supports a proffered interpretation of a disputed term. *Dore v. Arnold Worldwide*, *Inc.*, 39 Cal. 4th 384, 391 (2006). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but

whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* (internal quotation marks and citation omitted). If admitted, extrinsic evidence is used to ascertain the "objectively reasonable expectation of the promisee." *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006) (internal quotation marks and citations omitted). If extrinsic evidence does not help make sense of an ambiguous term, then "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." *Id.* at 695-66 (quoting Cal. Civ. Code § 1654).

To the extent that the parties proffered extrinsic evidence before the district court, it took the form of (1) screenshots of the ATM screen prompts; (2) testimony from BOA employees; and (3) expert testimony on industry standards for ATMs. *See Schertzer*, 2022 WL 1004559, at *9-12.

The district court evaluated the extrinsic evidence in terms of whether it showed that BOA had control or oversight over the ATMs. *See id.* Among other things, the district court concluded that the evidence showed that "[BOA] has no relationship with Cardtronics or FTCI that would allow it to assert any control over the screens at issue"; "[BOA] . . . must respond to OON requests for balance information and cannot selectively respond based on customer 'intent'"; and, "[BOA] cannot distinguish whether a customer using an OON ATM pressed a button asking to have the balance printed on the screen or on a receipt." *Id.* at 11.

BOA's control over the ATM Operators is not relevant to the parties' contract dispute. This case does not concern the actions of a third party—it concerns BOA's actions, because it was BOA that charged Plaintiff the challenged

second OON fee.  Extrinsic evidence of BOA's control over the ATM Operators is irrelevant.

There is also some extrinsic evidence that undermines BOA's interpretation of "balance inquiry."  For example, the Network Rules allow BOA to decline ATM balance inquiry requests under certain circumstances, such as when there is "fraud or credit risk presented by individual cardholder usage patterns."  None of these circumstances apply here, but the provision demonstrates that BOA can and does evaluate *objective* circumstances to determine whether a customer actually made a particular transaction.  This undermines the credibility of BOA's argument that it cannot determine if a customer is making a balance inquiry without probing their subjective intent.  It also contradicts the district court's finding that BOA "must respond to OON requests for balance information" without exception.

Because we conclude that extrinsic evidence does not support a proffered interpretation of the contract, we must construe any "ambiguous language against the interest of the party that drafted it." *Juarez v. Wash Depot Holdings, Inc.*, 24 Cal. App. 5th 1197, 1203 (2018) (citing Cal. Civ. Code § 1654).  Further, "[t]his rule applies with particular force in the case of a contract of adhesion." *Id.*  BOA does not dispute that the Account Documents are a contract of adhesion.  None of its terms were negotiated, and Plaintiff could only accept or reject it. *See Badie v. Bank of America*, 67 Cal. App. 4th 779, 785-86 (1998) (noting that contracts between BOA and credit card holders were "undisputed[ly] . . . contracts of adhesion").

We do not see the term "balance inquiry" as an ambiguous term.  As discussed above, Plaintiff's interpretation of "balance inquiry" reflects its ordinary and

popular meaning.  Even if the term "balance inquiry" were to be considered ambiguous, it would then be construed against its drafter, BOA, leading to the same conclusion we reach on grounds of the language's plain meaning.

## II.   <u>Implied Duty of Good Faith and Fair Dealing</u>

In addition to breach of contract, Plaintiff contends that BOA breached the covenant of good faith and fair dealing, which is implied in every contract in California.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988).  A breach of the implied duty of good faith and fair dealing goes beyond a breach of contract and involves "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (1990).

A breach of this covenant is common in cases where one party has discretionary power in the performance or enforcement of the contract but abuses that discretion to deprive the other party of a contractual benefit the other reasonably expected.  *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385 (2001).  However, "no obligation can be implied that would result in the obliteration of a right expressly given under a written contract." *New Hampshire Ins. Co. v. Ridout Roofing Co.*, 68 Cal. App. 4th 495, 505 (1998) (internal quotation marks and citation omitted).  Also, "if the plaintiff's allegations of breach of the covenant of good faith 'do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already

claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'" *Bionghi v. Met. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1370 (1999) (quoting *Careau*, 222 Cal. App. 3d at 1395).

Plaintiff claims that BOA breached the covenant of good faith and fair dealing by abusing the discretion purportedly provided to BOA by the phrase "We may also charge you fees."  Plaintiff further contends that BOA "interpret[ed] . . . the undefined term 'balance inquiry' unreasonably" in a manner that gave the bank "carte blanche discretion to assess OON Fees anytime an ATM machine or network requested a balance inquiry."

This claim is indistinguishable from Plaintiff's breach of contract claim.  It hinges on contract interpretation, and not on any alleged attempt by BOA to frustrate "the agreed common purposes" of the contract.  *Careau*, 222 Cal. App. 3d at 1394.  Plaintiff's implied covenant claim is rendered duplicative and unnecessary by our interpretation of "balance inquiry" and our conclusion that Plaintiff had properly alleged a claim of contract breach based on BOA's charging a second OON fee without authorization.  By concluding that BOA was permitted to charge OON fees only for customer-initiated balance inquiries, we necessarily conclude that BOA had an *express* duty to limit its fees to such inquiries.  This express duty renders the implied duty of good faith and fair dealing superfluous.  *See New Hampshire Ins. Co.*, 68 Cal. App. 4th at 505 (express rights override implied rights); *Bionghi*, 70 Cal. App. 4th at 1370 (implied covenant claims that mirror breach claims are superfluous).

We affirm the district court's grant of summary judgment for BOA on Plaintiff's good faith and fair dealing claim.

## III.  Pre-Dispute Procedures

BOA contends that Plaintiff's failure to follow the contract's pre-dispute procedures presents an independent ground for summary judgment.  The district court rejected this assertion, and we agree.

In a section titled "Reporting Problems," the Deposit Agreement states:

> If you find that your records and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement.
>
> * * *
>
> Problems or unauthorized transactions include: suspected fraud; missing deposits; unauthorized electronic transfers; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you to us; and counterfeit checks. This is not a complete list.

The Deposit Agreement gives customers 60 days to notify BOA of such problems, after which point they "may not bring any legal proceeding or action against us to recover

any amount alleged to have been improperly paid out of your account."

It is undisputed that Plaintiff here did not use these procedures to report the second OON charge that she incurred at a non-BOA ATM. *Schertzer*, 2022 WL 1004559, at \*14-15. The district court nonetheless correctly held that the procedures do not apply to this case because, *inter alia*, "the issues listed as 'problems' in the notice provisions seem to relate to major issues such as fraud and unauthorized or stolen checks." *Id.* at \*16. As the district court noted, every example of "[p]roblems or unauthorized transactions" refers to fraudulent activity in which another person gains unauthorized access to the customer's funds. There is no indication that the reporting procedure covers situations in which a customer believes that BOA has overcharged them in violation of the contract. We affirm the district court's denial of summary judgment for BOA based on Plaintiff's not following these pre-dispute procedures.

## IV. <u>Class Certification</u>

"Rule 23(b)(3) permits a party to maintain a class action if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1173 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(b)(3)), *aff'd*, 133 S. Ct. 1184 (2013). The district court denied Plaintiff's motion for class certification because common questions of fact or law did not predominate over individual ones. *See Schertzer*, 2022 WL 1004559, at \*17-20. The district court broadly cited three areas in which it had concluded that individual

considerations predominated over common ones: (1) the subjective intent of each class plaintiff; (2) variations in the ATM prompts that different class plaintiffs saw; (3) different states' laws that applied to different plaintiffs. *See id.*

Our interpretation of "balance inquiry" ameliorates the "subjective intent" concern. Our interpretation of the term does not require probing the subjective intent of individual ATM customers. For this reason, we vacate the district court's denial of class certification. It is unclear how our holding might affect the other two concerns identified by the district court. We remand for the district court to reconsider class certification.

## CONCLUSION

For the foregoing reasons, we: (1) REVERSE the district court's grant of summary judgment for BOA on Plaintiff's breach of contract claim; (2) REVERSE the district court's denial of Plaintiff's motion for reconsideration; (3) AFFIRM the district court's grant of summary judgment for BOA on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing; (4) AFFIRM the district court's denial of summary judgment for BOA on the grounds that Plaintiff did not follow pre-dispute procedures; (5) VACATE the district court's denial of class certification; and, (6) REMAND with instructions for the district court to reconsider class certification and for further proceedings consistent with this disposition.